**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| vs. | ) | |
| | ) | |
| Micheal Fisher, | ) | Case No. 1:08-cr-026 |
| | ) | |
| Defendant. | ) | |

_____

## I.  BACKGROUND OF THE CASE

On April 23, 2008, an eleven-count indictment was filed in United States District Court charging the defendant, Micheal L. Fisher, and co-defendants Amiel Schaff, and Fisher Sand & Gravel Co., Inc., with various allegations of filing false tax returns and conspiracy to defraud.  On December 11, 2008, a superseding indictment was filed which asserted the same charges and added an additional defendant, Clyde Frank.  Count one charges conspiracy to defraud in violation of 18 U.S.C. § 371.  Counts two and three charge Micheal Fisher with making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1).  Count four charges Clyde Frank with aiding and assisting in the preparation and presentation of a false tax return in violation of 26 U.S.C. § 7206(2).  Counts five and six charge Micheal Fisher with aiding and assisting in the preparation and presentation of a false tax return in violation of 26 U.S.C. § 7206(2).  Counts seven and eight charge Clyde Frank with making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1).  Counts nine through twelve charge Micheal Fisher with making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1).

On May 29, 2009, Micheal Fisher appeared at a change of plea hearing in Bismarck, North Dakota.  Fisher entered open guilty pleas to counts 1, 2, 3, 5, 6, 9, 10, 11, and 12 of the superseding

indictment.  The offense conduct to which Fisher pled guilty is focused on (1) the submission of Fisher's and other Fisher family members expenses to Fisher Sand & Gravel for payment; (2) the accounting of those expenses as business expenses; (3) the concealment of those expenses on the books and records of Fisher Sand & Gravel and from the accountants; and (4) the signing and filing of materially false tax returns, both for Fisher Sand & Gravel and Micheal Fisher.  The Court accepted the pleas and ordered that a Presentence Investigation Report (PSR) be prepared.  Fisher was released on his own personal recognizance with no pretrial supervision.

With respect to the other defendants, co-defendant Fisher Sand & Gravel entered into a deferred prosecution agreement with the Government which waived speedy trial of the case through December 31, 2011.  Pursuant to the agreement, Fisher Sand & Gravel Co., Inc., paid a total settlement amount of $1,168,141 which included $668,141 in restitution for unpaid corporate income taxes, a fraud penalty, interest, and a $500,000 fine.  Co-defendants Amiel Schaff and Clyde Frank entered pleas of guilty to count one of the superseding indictment and were sentenced on October 26, 2009.

The first phase of the sentencing hearing was conducted on October 14-15, 2009.  Both parties were afforded the opportunity to present evidence designed to address the disputed facts in the PSR and the parties' objections to the Sentencing Guideline calculations.  The objections primarily related to the tax loss calculations, the defendant's role in the criminal activity, and the defendant's criminal history.  The parties submitted post-hearing briefs on November 9, 2009.

A.    **FISHER SAND & GRAVEL**

Fisher Sand & Gravel Co., Inc., is a North Dakota corporation with its principal place of business in Dickinson, North Dakota and Phoenix, Arizona.  Fisher Sand & Gravel employs more than 1,000 persons and has a nationwide presence.  The corporation does in excess of $100 million in annual sales.  Fisher Sand & Gravel is primarily engaged in mining and the sale of aggregate, gravel, and crushed rock, and the manufacture, sale, and repair of aggregate and mining equipment systems.

After graduating from college in 1997, the defendant, Micheal Fisher, began employment with Fisher Sand & Gravel and obtained a minority ownership interest in the company.  In 1998, the majority owners, Gene Fisher and Sheila Fisher, transferred ownership of Fisher Sand & Gravel to their sons, Tom Fisher and Micheal Fisher.  During calendar years 2001-2004, Micheal Fisher maintained the position of vice-president and was a member of the Board of Directors.  He was the highest ranking executive at Fisher Sand & Gravel's corporate headquarters in Dickinson.  During this same time frame, co-defendant Clyde Frank was the corporate secretary, comptroller, and a member of the Board of Directors.  Co-defendant Amiel Schaff was the Chief Financial Officer, treasurer, and also a member of the Board of Directors.  Both Schaff and Frank had been employed at Fisher Sand & Gravel for more than thirty years.

Amiel Schaff testified at hearing on October 15, 2009.  Schaff was employed at Fisher Sand & Gravel for thirty-four years as the Chief Financial Officer, treasurer, and a member of the Board of Directors.  He reported directly to Micheal Fisher and had daily interaction with him.

Micheal Fisher was the top-ranking official of Fisher Sand & Gravel in North Dakota.  Fisher Sand & Gravel also has offices in Arizona.  The Accounting Department of Fisher Sand & Gravel

in Dickinson handles the payment of all invoices for the corporation.  Amiel Schaff said Fisher would, on occasion, request that certain invoices on projects be paid, and Fisher would also submit personal expenses to the Accounting Department for payment.  Fisher owned a company known as Badland Properties, LLC, as well as a truck stop and convenience store located in Dickinson known as "Tiger Discount."

Schaff is intimately familiar with the coding and payment of invoices submitted by vendors to Fisher Sand & Gravel.  Schaff said Tooz Construction in Dickinson was the primary contractor on a major remodeling project that was done at the Tiger Discount truck stop in 2002-2003.  Many of the invoices submitted by Tooz Construction to Fisher Sand & Gravel on this project were charged to the Smythe Mine Job which is located in Texas.  See Exhibit No. 61.  Most of those invoices were approved or "ok'd" by Micheal Fisher.  Schaff said Fisher Sand & Gravel paid in excess of $200,000 for the remodeling of the Tiger Discount truck stop.  Although Fisher Sand & Gravel leased some lots that were located near Tiger Discount, none of the payments made on invoices for the remodeling of Tiger Discount were coded as rental payments or back rent, i.e., business expenses.  According to Schaff, Tom Fisher, the president of Fisher Sand & Gravel, said he felt there was approximately $200,000 that was owed to Tiger Discount by Fisher Sand & Gravel for back rent.  However, no documentation exists to support such a claim.

Schaff said several members of the Fisher family would submit invoices for personal expenses and request that the expenses be paid by Fisher Sand & Gravel.  The "catch-all" account for such family personal expenses was entitled "Job 255" which is the internal job code used by the Accounting Department for rental property/business expenses.

4

Schaff identified a number of invoices for personal expenses that were ultimately paid by Fisher Sand & Gravel as business expenses. The invoices included a Disney cruise for Fisher family members of $38,305; charter air travel to and from Kentucky in the amount of $12,415; payments to a Dickinson law firm, and medications for Gene Fisher. See Exhibit Nos. 27-08, 38-01, and 42-01 through 42-21. There were also invoices paid for occupational therapy expenses for Sheila Fisher, the preparation of a prenuptial agreement for Micheal Fisher, water bills for the Fisher family members, the rental of a condominium in Scottsdale, Arizona, for Tom Fisher and his parents, and electrical bills for Gene and Sheila Fisher. See Exhibit Nos. 43-01, 43-01, 49-01, 58-01 through 58-46, 59-01 through 59-08, and 68-01 through 68-46. The record reveals that Fisher Sand & Gravel also paid Sheila Fisher $10,000 per month for "consulting" after she was bought out by Tom Fisher and Micheal Fisher. This was in addition to a corporate buyout of Sheila Fisher's stock in the corporation which amounted to $100,000 per month for sixty (60) months beginning in 1998. Schaff said it was his understanding that the $10,000 per month paid to Sheila Fisher as a "consulting" fee was actually money that was used to assist David Fisher's family in Phoenix after David Fisher was terminated as an employee in August of 2003.[1] Schaff said that Micheal Fisher was aware the sum of $10,000 per month was being run through the corporation as a business expense.

Schaff testified that in 2003-2004, Micheal Fisher built a large home in Dickinson. Fisher ran many of the work invoices on the residence through Fisher Sand & Gravel as business expenses. According to the testimony of Micheal Fisher, the residence was built at a cost of approximately $900,000. A metal building with an indoor tennis court and basketball court was built adjacent to the residence. This structure was built at a cost of approximately $170,000. The employees in the

---

[1] In September 2003, this Court sentenced David Fisher to 60 months in federal prison as a result of a plea of guilty to charges of possession of material involving the sexual exploitation of minors.

Accounting Department would code the invoices on this residential construction project to "Job 255." Schaff said that when the IRS began an audit in late 2003 or early 2004, one of the "red flags" raised were the expenses paid by the corporation for Micheal Fisher's residence. As a result of the IRS audit in 2003-2004, Fisher Sand & Gravel was informed that it needed to "reclassify" those personal expenses to be coded as a note payable to Micheal Fisher. Schaff said that as a result of the reclassification of the personal expenses, the sum of $240,762 was reclassified on the books. See Exhibit Nos. 21-01 through 21-05.

Carol Grinsteinner testified at the evidentiary hearing on October 15, 2009. She has been an employee of Fisher Sand & Gravel for twenty-one years and is presently employed as the comptroller. Prior to January 2009, Grinsteinner's title was accounts department supervisor where she was responsible for the supervision of ten (10) employees. Grinsteinner said the Accounting Department is responsible for paying invoices after the invoices have been coded to a specific job or project. Grinsteinner said Micheal Fisher was not responsible for coding and she had little direct contact with Fisher.

Grinsteinner was aware that Micheal Fisher was running expenses that were incurred in the construction of his personal residence through Fisher Sand & Gravel as business expenses. She said the Accounting Department decided to create a separate account in order to track Fisher's home construction expenses. Such expenses were coded to "Job 255." Grinsteinner said she worked closely with the auditors from Eide Bailey who conducted annual audits on Fisher Sand & Gravel. She recalled the IRS audit conducted in 2004-2005 and that audit focused on travel expenses as well as the expenses coded to "Job 255." Grinsteinner said after the IRS audit in 2004-2005, the "Job

6

255" expenses that were personal in nature were reclassified to a notes payable account of Micheal Fisher.

Grinsteinner acknowledged that after the IRS audit was conducted in 2004-2005 and the decision was made to reclassify the personal expenses, Micheal Fisher was given a stack of invoices and was asked to review the invoices and note whether they were personal in nature or business-related expenses.  Grinsteinner said Fisher may have made some mistakes in his review of the invoices.  Grinsteinner acknowledged that any questions she had concerning how different invoices were to be coded were directed to her immediate supervisors, Amiel Schaff and Clyde Frank. Grinsteinner was never indicted as a result of her involvement in the activities of Micheal Fisher. The  Court finds by a preponderance of the evidence that, based on the limited record before the Court, Grinsteinner lacks criminal responsibility for the commission of any offense.

Kim Groll has been employed with Fisher Sand & Gravel for the past thirteen years as an accounts payable support staff member.  She was employed in that capacity during the years 2001-2004.   Groll reported directly to Amiel Schaff and Clyde Frank.   Her primary duties and responsibilities included the coding and payment of invoices.  During the calendar years 2001-2004, Groll performed this job function along with another payroll department employee, Scott Wax. Groll said Clyde Frank was the individual who primarily reviewed all of the invoices and the checks issued on those invoices.  Groll said Fisher Sand & Gravel would receive approximately 10,000 invoices per month for coding and payment.

Groll was aware there were invoices submitted to the corporation for payment for work done on Micheal Fisher's residence in Dickinson as well as the remodeling of the Tiger Discount gas station owned by him.  She said those expenses would be coded to "Job 255" which was the account

created to track the personal expenses of Micheal Fisher and other Fisher family members.  In 2001, there was a total of $71,039 in personal expenses coded to "Job 255."  See Exhibit No. 13.  In 2002, the personal expenses coded to "Job 255" amounted to $288,224 which Groll said was primarily related to Micheal Fisher's residence.  Id.  In 2003, the total personal expenses coded to "Job 255" was $405,077 and in 2004, the total personal expenses coded to "Job 255" was $374,752.

With respect to Kim Groll's involvement with Micheal Fisher, Groll had little contact with Micheal Fisher other than to meet and greet him in the hallway at the corporate offices in Dickinson.  Groll was never indicted for her role in these offenses.  The Court finds by a preponderance of the evidence that, based on the limited record before the Court in these proceedings, Groll lacks criminal responsibility for the commission of the offenses.

Kathy Davis has been employed at Fisher Sand & Gravel for the past eleven years as a transportation assistant.  Her immediate supervisor is Richard Simek, the transportation manager.  Davis recalled an incident when she reviewed an invoice for work that had been performed by employee Mark Makota on the Tiger Discount gas station.  Davis said Mark Makota was a building maintenance employee at Fisher Sand & Gravel.  Part of Davis's responsibilities were reviewing the time sheets of employees.  Davis determined that Makota had actually been working on the Tiger Discount gas station owned by Micheal Fisher so she coded Makota's time directly to Micheal Fisher as a personal expense.  Shortly thereafter, Micheal Fisher contacted Davis and questioned why he was being billed for Mark Makota's work at the gas station.  The record reveals that Makota spent one week, or approximately forty hours, tearing up tile at the Tiger Discount gas station during the remodeling project in 2002-2003.

According to Davis, Micheal Fisher was agitated and informed her that he should not have received a bill for Mark Makota's time.  Davis said shortly after her conversation with Micheal Fisher, Fisher contacted her supervisor (Richard Simek) and was told to reverse the charges.  Davis admittedly had little contact with Micheal Fisher over the years.  Davis was never indicted for her limited role in the activities which resulted in criminal charges being brought against Micheal Fisher and the corporation.  The Court finds by a preponderance of the evidence that, based on the limited record before the Court, Davis lacks criminal responsibility for the commission of any offense.

Scott Wax was employed as an accounts payable support staff person in 2001-2004 at Fisher Sand & Gravel.  Wax is currently employed at FI Equipment in Dickinson which is another business partially-owned and operated by Micheal Fisher and other Fisher family members.

Wax said part of his duties and responsibilities as an accounts payable employee were to code bills and invoices that were received at Fisher Sand & Gravel.  Wax was also responsible for reviewing credit card statements submitted for payment.  Among items that had been submitted for payment on Micheal Fisher's credit cards were the costs of a wedding reception and open bar in January 2004 at the Elks Lodge in Dickinson in the amount of $3,322 (see Exhibit No. 39-01); lighting for Micheal Fisher's residence in the amount of $14,294 (see Exhibit No. 29-03); an architectural proposal on the residence in the amount of $12,200 (see Exhibit No. 31-01); and other personal expenses.  Some of the credit card items were charged to "Job 255" which was the special account designed to track the personal expenses of Micheal Fisher and other Fisher family members.  Wax never had any conversations with Micheal Fisher concerning any of these expenditures.  Wax said there was never any effort made to hide the personal expenses submitted to Fisher Sand & Gravel for payment.

According to Wax, when employees in the Accounting Department suspected that an expense item submitted for payment was actually a personal expense, it was simply coded to "Job 255" so it could be properly tracked as a personal expense rather than a business expense. Wax was unaware of how the personal expenses were ultimatley handled by the corporation. In essence, Wax was an accounts payable employee who coded invoices to specific accounts but never had any direct contact with Micheal Fisher concerning the payment of the invoices or expenses. Wax was never indicted for his limited role in these activities. The Court finds by a preponderance of the evidence that, based on the limited record before the Court, Wax lacks any criminal responsibility for the offenses charged.

Clyde Frank testified at the evidentiary hearing on October 16, 2009. Frank was employed at Fisher Sand & Gravel for thirty-six years before he was terminated in June of 2008. Frank started as a bookkeeper at Fisher Sand & Gravel and ended his employment as the comptroller, secretary, and a member of the Board of Directors. Frank said Fisher Sand & Gravel originally started with approximately 32 employees in 1972. At the time he left the company in June 2008, the corporation had 1,100 employees.

Frank described the process of how invoices received in the Accounting Department were coded, checked, and paid. Frank became aware that Micheal Fisher was having Fisher Sand & Gravel pay for personal expenses incurred for the remodeling of the Tiger Discount gas station. Frank was also aware that the corporation paid for some of the expenses incurred in the construction of Micheal Fisher's residence in Dickinson. Frank said he discussed this subject with Amiel Schaff and Carol Grinsteinner in 2001. Frank said it was his decision that all personal expenses that had been approved for payment by Micheal Fisher, and which appeared to be personal in nature, were

to be coded to an account known as "Job 255."  Frank said this was an account that was segregated solely for the personal expenses incurred by Micheal Fisher and other Fisher family members.

In March of 2002, Frank met with Micheal Fisher because of concerns that he (Frank) had about the personal expenses of Fisher being paid by the corporation as business expenses.  Frank specifically discussed the expenses associated with the Tiger Discount remodeling project which amounted to approximately $400,000.  Frank said Micheal Fisher informed him that he "had that money coming" because of an agreement he had with Tom Fisher.  Micheal Fisher instructed Frank to simply leave those expenses on the book, or words to that effect.  Frank brought up the subject with Micheal Fisher because of Frank's concerns about filing fraudulent tax returns.  Frank did not sign the corporate tax return in 2001 because he said he knew the figures contained in that return were false.

Frank recalled that after the IRS audit in 2004-2005, Fisher Sand & Gravel reclassified a number of personal expenses that had been paid by the corporation and deducted as business expenses.  Those expenses were transferred to the shareholder note payable account on the books at the corporation.  Frank acknowledged that at the time the personal expenses were originally paid by the corporation, there was never an intent that such expenses would be treated as loans to Micheal Fisher.

On cross-examination, Frank acknowledged there had been other audits of Fisher Sand & Gravel conducted by the IRS in the past.  The issue during those audits was frequently the subject of personal expenses being paid by the corporation and treated as business expenses.  According to Frank, the IRS audits occurred in the 1970's, 1992-1993, and 2002-2003.  Although Frank indicated he had confronted Micheal Fisher on several occasions concerning the corporation's payment of his

personal expenses, Frank acknowledged on cross-examination that he told the grand jury that he only confronted Fisher on one occasion which was related to the Tiger Discount remodeling project.

Kurt Ochsner is the IRS revenue agent who appeared as an expert witness on behalf of the Government. Ochsner has been employed as a revenue agent for the IRS for the past twenty-five years. Ochsner has conducted approximately 500-1000 audits.

Ochsner prepared a number of exhibits which summarized the corporate and individual tax losses. See Exhibit Nos. 118-01 through 118-09. Ochsner said he reviewed thousands of accounting entries at Fisher Sand & Gravel during the calendar years 2001-2004 and identified approximately 480 questionable entries for purposes of calculating the tax losses. A succinct summary of Ochsner's calculations from his detailed audit of the records at Fisher Sand & Gravel is set forth in Exhibit No. 118-07 which provides as follows:

### TOTAL TAX LOSS 2001-2004

|  | 2001 | 2002 | 2003 | 2004 | TOTAL |
|---|---|---|---|---|---|
| Micheal Fisher - Form 1040 | $123,808 | $63,148 | $68,270 | $52,843 | $308,068[2] |
| Fisher Sand & Gravel Co - Form 1120 | $106,164 | $58,994 | $91,167 | $63,272 | $319,597 |
| **Total Tax Loss** | **$229,972** | **$122,142** | **$159,437** | **$116,115** | **$627,665** |

According to the evidence presented by the Government at the evidentiary hearing, the total corporate tax loss caused by the improper deduction of non-deductible personal expenses for the

---

[2] There is a calculation error on Government's Exhibit 118-07. The total should be $308,069 and the total tax loss should be $627,666 rather than $627,665. The Court will hereafter use the correct figures when referencing this exhibit.

calendar years 2001-2004 amounts to **$319,597**.  The total individual tax loss of Micheal Fisher for the calendar years 2001-2004 amounts to **$308,069**.  The total combined tax loss calculations amount to **$627,666**.  The calculations are supported in part by Exhibit Nos. 118-01 through 118-09, and the testimony of Ochsner.


### B.    THE PRESENTENCE REPORT

The offense conduct is set forth in detail in the Presentence Investigation Report (PSR). Paragraph 16 of the PSR states that during 2001-2004, Micheal Fisher, along with co-defendants Clyde Frank, Amiel Schaff, and others, authorized and caused Fisher Sand & Gravel to pay substantial amounts in personal expenses incurred by Micheal Fisher and his family members.  The personal expenses ranged from the payment of prescription medications for Gene Fisher in the amount of $220, to the construction and remodeling/renovation costs of property owned by Micheal Fisher.  This included, but was not limited to, his residence in Dickinson valued at $900,000, and the remodeling of the Tiger Discount truck stop and convenience store in Dickinson at a cost in excess of $400,000.  Under the authorization of Micheal Fisher, these personal, non-business expenses were paid by Fisher Sand & Gravel as business expenses and deducted as such on the company's corporate income tax returns for the tax years 2001-2004.  Micheal Fisher did not report the payments that the corporation made on his behalf, or under his direction or authorization, as income.

A United States Probation Officer prepared the PSR and calculated an adjusted offense level of 21, a criminal history category of III, and an advisory Guidelines sentence range of 46-57 months. The parties have had ample opportunity to note their objections to the PSR.  The Government

objected to paragraph 26 of the PSR and the calculations of tax loss.  The Government also objected to paragraphs 38-39 of the PSR which address the defendant's adjustment for his role in the offense under U.S.S.G. § 3B1.1.  The PSR recommended that Micheal Fisher be considered a manager or supervisor, that the criminal activity involved five or more participants, or "was otherwise extensive," and that a three-level increase was warranted for Fisher's role in the offense under U.S.S.G. § 3B1.1(b).  The Government contends that a four-level increase is warranted for the defendant's role as an organizer or leader of criminal activity under U.S.S.G. § 3B1.1(a) rather than a three-level increase.

Fisher has also noted his objections to the PSR.  Counsel for Fisher objects to Micheal Fisher being classified as a direct supervisor to Clyde Frank and Amiel Schaff and believes that such a finding overstates his actual role.  Fisher contends the corporate Accounting Department had historically been run exclusively by Amiel Schaff and Clyde Frank and, therefore, no adjustment should be made for Fisher's role in the offense.  Fisher also objected to the tax loss calculations and the criminal history computations set forth in the PSR.  Fisher contends that a criminal history category III designation substantially over-represents the seriousness of his criminal history or the likelihood that he will commit other crimes.  The Court will address each of the objections.

## III.   LEGAL DISCUSSION

### A.   FISHER'S CRIMINAL HISTORY

Fisher criminal history is set forth in paragraphs 57-63 of the PSR.  Fisher does not dispute any of the prior convictions.  See Docket No. 191, p. 9.  Pursuant to U.S.S.G. § 4A1.1(c), application note 3, one point is added for each prior sentence unless the sentence was imposed more than ten

years prior to the defendant's commencement of the instant offense. The instant offense occurred between January 2001 and continued through at least September 19, 2005. The convictions set forth in paragraphs 59-61 of the PSR were imposed on May 4, 1994, May 18, 2001, and September 18, 2002, respectively. Therefore, all convictions are countable which resulted in a total of three criminal history points. In addition, it is undisputed that at the time of the instant offense, Micheal Fisher was on parole and probation under Docket Nos. 30-1-K-1377-1 and 02-F-03221. In accordance with U.S.S.G. §4A1.1(d), two points are added to the criminal history point calculations. As a result, the total number of criminal history points is five. According to the Sentencing Table at Chapter 5, Part A, five criminal history points establishes a criminal history category of III.

The Court finds by a preponderance of the evidence that the criminal history calculations and the total criminal history points as set forth in the PSR are accurate. No evidence has been presented to the contrary. The "equity-oriented" arguments raised in Fisher's post-hearing brief concerning the calculation of criminal history points are rejected. See Docket No. 191, pp. 9-11. The only unresolved issue is whether a downward departure is warranted for an over-represented criminal history.

Pursuant to U.S.S.G. § 4A1.3(b)(1), if there is reliable information that indicates the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted. See United States v. Bradford, 500 F.3d 808 (8th Cir. 2007); United States v. Payne, 81 F.3d 759 (8th Cir. 1996). In departing from the otherwise applicable criminal history category, the Court is required to state in writing the specific reasons why the criminal history

15

category substantially over-represents the seriousness of the defendant's criminal history or the likelihood the defendant will commit other crimes.  See U.S.S.G. § 4A1.3(c)(2).

Micheal Fisher was convicted of a DUI misdemeanor offense in 1994 in Kentucky when he was 21-years old and attending college.  See PSR, ¶ 59.  This resulted in one criminal history point. Another offense that resulted in the assessment of one criminal history point was theft of a license place in Kentucky in 2002.  See PSR, ¶ 61.  Micheal Fisher is currently 36-years old and is a non-violent offender.  During these proceedings, Fisher was released on his own personal recognizance with no pretrial supervision.  The Court finds that the evidence clearly establishes that a criminal history category III designation substantially over-represents the seriousness of the defendant's criminal history or the likelihood he will commit other crimes.  The Court and the United States Probation Office are convinced of this fact.

The Court finds that same sentiment is apparently shared by the Government because, throughout this entire criminal prosecution, the Government has never opposed Fisher's release on his own personal recognizance without any pretrial services supervision.  Fisher has been cooperative and compliant throughout these proceedings.  A misdemeanor DUI as a 21-year old college student and theft of a license place do not equate with a serious criminal history.  In its post-hearing brief the Government took a rather Draconian approach and argued that Fisher's criminal history would support an upward departure under the advisory Sentencing Guidelines.  See Docket No. 193, p. 15.  However, the Government's actions towards Fisher during these proceedings speak louder than the harsh words in a brief.  Common sense and fairness dictate a more reasonable approach in assessing the seriousness of Fisher's criminal history.

The Court is convinced that a downward departure to criminal history category II more accurately reflects Fisher's criminal history category and, as a practical matter, has no significant impact on the sentence to be imposed. The Court finds that a downward departure to criminal history category II is warranted, appropriate, and is supported by the preponderance of the evidence.

### B.      TAX LOSS CALCULATIONS

It is well-established that the Government has the burden at sentencing to prove tax loss by a preponderance of the evidence. United States v. Tucker, 217 F.3d 960, 961 (8th Cir. 2000). The amount of the tax loss may be made based on a reasonable estimate from the available facts. United States v. Ervasti, 201 F.3d 1029, 1042 (8th Cir. 2000). The Eighth Circuit has noted that it may be reasonable for the sentencing judge to simply "split the difference" between two possible extremes. United States v. Radtke 415 F.3d 826, 844 (8th Cir. 2005) (citing United States v. Berndt, 86 F.3d 803, 811 (8th Cir. 1996).

The Sentencing Guidelines provide that tax loss is "the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." U.S.S.G. § 2T1.1(c)(1). "[I]f the offense involved filing a tax return in which gross income was under reported, the tax loss shall be treated as equal to 28% of the under-reported gross income (34% if the taxpayer is a corporation) ..., *unless a more accurate determination of the tax loss can be made*." Section 2T1.1(c)(1), Note (A) (emphasis supplied). The same rule applies to the computation of tax loss when the criminal conduct involves claiming a false deduction. When an offense involves both individual and corporate tax returns, "the tax loss is the aggregate tax loss from the offenses added together." Id. Note (D); United States v. Patti, 337 F.3d 1317, 1323 (11th

Cir. 2003) (noting that "aggregation of personal and corporate tax losses is called for under the guidelines"); United States v. Cseplo, 42 F.3d 360, 364 (6th Cir. 1994) ("The guidelines are very specific about the necessity of aggregating the tax losses... ."). When the case involves a conspiracy, a co-conspirator is held responsible for all tax loss that is "reasonably foreseeable in furtherance of jointly undertaken criminal activity." United States v. Mickle, 464 F.3d 804, 808 (8th Cir. 2006).

The Sentencing Guidelines "authorize a court to avoid the presumptive tax rates [of 34% and 28%] if a 'more accurate determination' of the tax loss can be made." United States v. Spencer, 178 F.3d 1365, 1368 (10th Cir. 1999); accord United States v. Blevins, 542 F.3d 1200, 1201 n.2 (8th Cir. 2008). A majority of the courts have held the tax loss definitions in the Guidelines should not be read to permit a defendant convicted of tax fraud to reduce the tax loss by claiming legitimate but unclaimed deductions. See Blevins, 542 F.3d at 1202-03.

### 1.   THE PSR'S TAX LOSS CALCULATIONS

The tax loss calculations are set forth in paragraphs 21-26 of the PSR. The offense level computations which relate to the tax loss are set forth in paragraphs 35, 42, and 48 of the PSR. With respect to count one (conspiracy to defraud), the applicable Sentencing Guideline is found at U.S.S.G. § 2T1.9. This section provides for the base offense level to be determined from Section 2T1.1 or 2T1.4 as appropriate and corresponding to the amount of the tax loss. The PSR established that the instant offense involved a tax loss of $599,412. As a tax loss greater than $400,000, but less than $1,000,000, the result is a base offense level of 20 pursuant to U.S.S.G. § 2T4.1(H). See PSR, ¶ 35.[3]

---

[3] The PSR erroneously cited to Section 2T4.1(G) rather than the correct section of 2T4.1(H). The Court will hereafter replace the correct subsection (H) when referencing the PSR.

With respect to counts 2, 3, 9, 10, 11, and 12 (making and subscribing false tax returns), the applicable Sentencing Guideline for a violation of 26 U.S.C. § 7206(1) is found in U.S.S.G. § 2T1.1 and provides for a base offense level obtained from the tax tables at Section 2T4.1, based upon the tax loss.  The PSR established that the offense involved a tax loss of $599,412 which equates with a base offense level of 20 under U.S.S.G. § 2T4.1(H).  See PSR, ¶ 42.

With respect to counts five and six (aiding and assisting the preparation and presentation of a false tax return), the Sentencing Guideline for a violation of 26 U.S.C. § 7206(2) is found in U.S.S.G. § 2T1.4 and provides for a base offense level obtained from the tax table at Section 2T4.1 based upon the tax loss.  The PSR established that this offense involved a tax loss of $599,412 which also equates with a base offense level of 20 pursuant to U.S.S.G. §2T4.1(H).  See PSR ¶ 48.

In summary, the PSR established the total amount of tax loss for Sentencing Guideline calculation purposes is Fisher's individual tax loss of $292,839 plus the corporate tax loss of $306,573, resulting in a total tax loss of $599,412.  The PSR actually showed a total tax loss of $599,411 rather than $599,412 but the error was a mathematical one.

## 2.    THE GOVERNMENT'S TAX LOSS CALCULATIONS

The Government introduced evidence through IRS Agent Ochsner to establish that the tax loss from the four false corporate tax returns for tax years 2001 through 2004 is $319,597, the tax loss from Fisher's four false individual income tax returns for the same tax years is $308,069, with an aggregate tax loss of $627,666.  See Exhibit No. 118-07.  Ochsner determined the appropriate adjustments to Fisher Sand & Gravel's income and Micheal Fisher's income based upon an exhaustive review of all available evidence.  Ochsner testified that each false expense was analyzed

individually based upon the corporation's general ledger, source documents from paid invoice files, third-party documents, sworn declarations of the third-party vendors, and grand jury testimony, all of which were admitted into the record.  With respect to the corporate tax loss, all of the personal expenses of Micheal Fisher and Fisher family members are counted because the tax loss arising from the fraudulent deduction of those expenses on the corporate tax returns were reasonably foreseeable to Fisher.

Ochsner also reviewed every individual expense and made a separate determination as to whether each expense could be attributable to Fisher as income.  The adjustments to Fisher's income were (1) expenses paid by the corporation that were a direct benefit to Fisher; or (2) personal expenses Fisher personally authorized the corporation to pay even though one of Fisher's family members may have received the direct benefit; and (3) personal expenses paid by Fisher and/or Badlands Properties, LLC that were fraudulently deducted on Fisher's Schedules E as business expenses.  See Exhibit Nos. 118-04, 118-05; 118-06; see also Sachs v. C.I.R., 277 F.2d 879, 882 (8th Cir. 1960) (holding that corporate payments to third parties for the personal debts of a shareholder are constructive dividends); Hagman v. C.I.R., 958 F.2d 694, 691 (6th Cir. 1992) (holding that corporate payments for personal expenses of family members caused by virtue of shareholder's "corporate control" should be viewed as dividends to the shareholder that were then redirected to the family members.  Using those adjustment amounts, the tax loss was computed using the tax returns as filed by Fisher Sand & Gravel and Micheal Fisher and applying the correct marginal tax rate and other automatic adjustments made under the Internal Revenue Code to determine the tax loss.  See Exhibit Nos. 118-03, 118-06.  The total tax loss of $627,666 yields a base offense level of 20.  See U.S.S.G. § 2T4.1(H).

### 3.      **FISHER'S TAX LOSS CALCULATIONS**

As previously noted, the first phase of the sentencing hearing was conducted on October 15-16, 2009.  The Court informed the parties they were to present evidence to address the disputed facts in the PSR and any objections raised to the Sentencing Guideline calculations.  There is no dispute that the primary objection raised by both parties related to the tax loss calculations.   The total tax losses has been the most contested issue for months before the hearings in October 2009, and a contentious issue neither party has been willing to concede an inch to resolve.  Apparently for tactical reasons, counsel for Fisher did not present any expert witness testimony on the subject of tax losses at the evidentiary hearing.  Instead, a 29-page expert report on the tax loss calculations was attached as an exhibit to the post-hearing brief (which was to be limited to 15-pages) and submitted for the first time on November 9, 2009.  See Document No. 191-1.  The Government argues that Fisher should not be allowed at this late stage to introduce different tax loss computations after the evidentiary hearing because there was ample time to present such evidence both before and during the hearing on October 15-16, 2009.  The Court agrees that the late disclosure of the expert report smacks of unfairness and was ill-advised.  Nevertheless, each of the tax loss calculations submitted by the parties will be addressed in this memorandum in order to avoid adding to the litany of appealable issues.

The Court would note that at the evidentiary hearing on October 15, 2009, counsel for Fisher said the individual tax loss amounted to $135,726 and the corporate tax loss amounted to $313,697 resulting in a total tax loss of $449,423.  Under Section 2T4.1(H) of the Sentencing Guidelines, a tax loss of more than $400,000 but less than $1,000,000 results in an offense level of 20.  This was the same offense level as determined in the PSR.  However, in the post-hearing submissions, counsel

for Fisher has taken a different tactic and merely concedes a tax loss of $168,205.  <u>See</u> Document

No. 191-1, p. 3.

As noted, the conceded tax loss of $168,205 was first identified in the expert report of Mark

Larson, CPA, which was prepared following the evidentiary hearing.  Larson opined that the tax loss

calculations presented by the Government are the equivalent of a civil tax calculation and do not

reflect the proper calculated amount of federal tax losses directly attributable to the criminal conduct

of Fisher.  In essence, Fisher's expert witness has concluded that any tax loss in excess of $168,205

relates to a level of negligence which does not equate with fraud and cannot be attributable to any

intent to commit criminal activity.  The tax loss calculations compiled by Larson reveal a total tax

loss of $168,205, which amount includes a corporate tax loss of $110,478 and an individual tax loss

of $57,727.  <u>See</u> Document 191-1 (29-page report of Mark Larson, CPA).

It is well-established that the amount of the tax loss may be made based on a reasonable

estimate from the available facts.  <u>United States v. Ervasti</u>, 201 F.3d 1029, 1042 (8th Cir. 2000).

The sentencing judge is in a unique position to be able to assess the evidence and estimate the loss.

In this case, the Court is left with two very diverse tax loss calculations which are at both ends of

the extreme.  The Eighth Circuit has expressly noted that it is reasonable for the court to simply

"split the difference" between two possible extremes, particularly where the loss attributable to

fraudulent conduct is unclear because the relevant conduct involved is seeped in secrecy.  The

district court's determination of tax loss calculations is to be afforded appropriate deference based

on the court's unique position to assess the evidence and estimate the loss.  <u>United States v. Parish</u>,

565 F.3d 528, 534 (8th Cir. 2009).  In computing the amount of tax loss, if the offense involves both

individual and corporate tax returns, the tax loss is the aggregate tax loss from the individual tax offense and the corporate tax offense added together.  See U.S.S.G. § 2T1.1, application note 7.

The Court finds by a preponderance of the evidence that the corporate federal income tax loss amounts to **$319,597**.  This amount is supported by the testimony of IRS revenue agent Kurt Ochsner who conducted a comprehensive and detailed evaluation of a multitude of invoices and vendor documents paid by Fisher Sand & Gravel from 2001-2004.  See Exhibit Nos. 118-01 through 118-09.  The Court further finds by a preponderance of the evidence that Fisher's individual tax loss amounts to **$308,069**, which results in a total or aggregate tax loss of **$627,666**.

The Court rejects the tax loss calculations proposed by Fisher.  The undersigned is only required to make a "reasonable estimate of the loss" and finds that the tax loss calculations proposed by Fisher are neither reasonable nor in conformance with the Sentencing Guidelines.  Further, even if the tax loss calculations as proposed by Fisher were deemed at some later date to be reasonable and in conformance with the Guidelines, the Court would then be inclined to "split the difference" between the two extremes ($627,666 vs. $168,205) which would result in a tax loss in the range of $400,000.  Under U.S.S.G. § 2T4.1, the net result would be an offense level of either 18 or 20 with the Court being more inclined to find an offense level of 20 under the circumstances rather than 18.

In summary, the Court finds by a preponderance of the evidence that the tax loss calculations under the Sentencing Guidelines have been established by a preponderance of the evidence and are reasonable estimates of the losses.  The losses amount to a corporate tax loss of **$319,597** plus an individual tax loss of **$308,069**, which results in a total or aggregate tax loss of **$627,666**.  This correlates with a base offense level of 20 pursuant to U.S.S.G. § 2T4.1(H) as it is a tax loss greater than $400,000.

C.   **ADJUSTMENT FOR ROLE IN THE OFFENSE**

It is well-established that the Government has the burden of proving by a preponderance of the evidence that the aggravating role enhancement is warranted.  United States v. Garcia-Hernandez, 530 F.3d 657, 665 (8th Cir. 2008); United States v. Mesner, 377 F.3d 849, 851-52 (8th Cir. 2004).  U.S.S.G. § 3B1.1 provides as follows:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a)   If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
>
> (b)   If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
> (c)   If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1 (emphasis in original).  The commentary and application notes to Section 3B1.1 further provide that:

> 1.   A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted.  A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant.
>
> 2.   To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.  An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.
>
> 3.   In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

The PSR recommended that Micheal Fisher be considered a manager and supervisor and the criminal activity involved five or more participants, or "was otherwise extensive."  As a result, the offense level was increased by three levels in the PSR.  The Government objected and challenges the imposition of a three-level enhancement.  Fisher challenges any adjustment for a role enhancement.  The Government requests the Court find that a four-level increase pursuant to U.S.S.G. § 3B1.1(a) is warranted for Fisher's role as an organizer or leader of the criminal activity that involved more than five participants or "was otherwise extensive."

The Court finds that the upper echelon in the Accounting Department of Fisher Sand & Gravel were aware of, and authorized the payment of, certain personal expenses as business expenses.  The key accounting personnel include co-defendant Amiel Schaff as the Chief Financial Officer and co-defendant Clyde Frank as the comptroller.  Both men were indicted, pled guilty, and admitted criminal responsibility for the commission of the offenses.  The Court finds by a preponderance of the evidence that both Schaff and Frank are "participants" in the criminal activity involving Micheal Fisher and Fisher Sand & Gravel.  See U.S.S.G. § l3B1.1, application note 1.

The Court has carefully reviewed the Sentencing Guidelines and particularly U.S.S.G. § 3B1.1, and the commentary and application notes to that guideline provision.  The Court has also carefully considered all of the factors recommended in Section 3B1.1 which include the exercise of decision-making authority, the nature of the participation in the commission of the offense, recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and the authority exercised over others.

In essence, the conspiracy involved Micheal Fisher improperly and unlawfully identifying certain personal expenses as business expenses, authorizing the payment of such expenses by the corporation, and directing accounting personnel to code and pay for those expenses as business-related.  This appears to have been standard operating procedure at Fisher Sand & Gravel for decades.  Despite the fact the IRS conducted numerous audits of the corporation beginning in the 1970's, and began raising concerns ("red flags") over how the corporation handled the payment of personal expenses of Fisher family members, no one seemed to listen or heed those serious concerns.  The warnings from the IRS repeatedly fell on the deaf ears of Fisher family members.  The accounting personnel at Fisher Sand & Gravel simply followed the directives of their employer/manager/supervisor, Micheal Fisher and/or Tom Fisher.  The two brothers, who essentially owned and operated Fisher Sand & Gravel after 1998, were able to dictate how business was conducted.  Their sister, Suzanne Medley, who also testified at the evidentiary hearing, clearly understood that the personal expenses allocated to "Job 255" were a major problem for the corporation.  Surprisingly, both Micheal Fisher and Tom Fisher chose to also ignore their sister's concerns and thumbed their noses at the federal government, a tactic no reasonable person would ever understand in light of the annual net earnings of the corporation.  Simply stated, there was far more than enough money to go around to take care of the family's personal expenses in a lawful manner rather than cheat the federal government who was loudly barking at their door.

The Court finds there were several employees in the Accounting Department who were aware that certain questionable, personal expenses were being paid by the corporation as business expenses.  The key "participants" in the criminal activity were Micheal Fisher, Amiel Schaff, and Clyde Frank.  These individuals knew and were apparently concerned about the false information

being reported on the corporate tax returns.  These individuals unquestionably bear criminal responsibility for the offenses charged.  Whether a four-level enhancement as an organizer or leader of criminal activity applies, or a three-level increase for Fisher's role as a manager or supervisor applies, or a two-level increase under U.S.S.G. § 3B1.1(c), is a close call.  There are reasonable and compelling arguments for the imposition of an aggravating role adjustment.  However, the Court finds that the number of "participants" for purposes of triggering an upward adjustment under Section 3B1.1(a) or (b) has not been proven with any certainty by the Government.  Specifically, the Court finds that the Government has failed to prove by a preponderance of the evidence that Kim Groll, Kathy Davis, Scott Wax, or arguably, Carol Grinsteinner, were "participants" who are criminally responsible for the commission of the offenses.  Most of these individuals were non-supervisory employees of Fisher Sand & Gravel whose primary responsibility was to check invoices and code the invoices for payment.  None of these employees were aware of how the corporation ultimately chose to handle the payment of personal expenses for accounting and tax purposes. Based on the record before the Court, none of these persons have criminal responsibility for the commission of the offenses and, as such, are not "participants."

The Court finds by a preponderance of the evidence that the more appropriate and reasonable role adjustment enhancement is a two-level increase for Fisher's role as an organizer, leader, manager, or supervisor in any criminal activity other than as described in U.S.S.G. § 3B1.1(a) or (b). See U.S.S.G. § 3B1.1(c).  To be subject to a role enhancement under U.S.S.G. § 3B1.1(c), a defendant need only manage or supervise one other participant.  See United States v. Mata-Peres, 478 F.3d 875, 877 (8th Cir. 2007).  The Eighth Circuit has said that the term "manager" or "supervisor" is to be broadly construed under Section 3B1.1.  United States v. Erhart, 415 F.3d 965,

973 (8th Cir. 2005).  It is clear and undisputed that Micheal Fisher managed or supervised at least one other "participant" in the conspiracy (Amiel Schaff and Clyde Frank) and no one can make a reasonable argument to the contrary.

The Court finds that the Government has failed to sustain its burden of proof as to the triggering of a four-level increase under U.S.S.G. § 3B1.1(a) or (b).  The evidence that was presented by the Government at the evidentiary hearing was factually insufficient to support a four-level increase under U.S.S.G. § 3B1.1(a) or a three-level increase under U.S.S.G. § 3B1.1(b).  In summary, there was insufficient evidence to support a finding that the criminal activity involved five or more "participants" nor was there sufficient evidence presented to show that the criminal activity "was otherwise extensive," as required under U.S.S.G. § 3B1.1(a) or (b).

The Court further finds that the term "otherwise extensive" is extremely vague at best.  Nowhere in the Sentencing Guidelines, the commentary or application notes to the Guidelines, or case law is the term clearly defined.  Arguably, the amount of the tax loss and the duration of the criminal activity on the part of Micheal Fisher and the corporation could reasonably be considered "extensive" in this case.  However, a defendant facing a sentencing enhancement for an aggravating role under Section 3B1.1(a) or (b) in a tax fraud case such as this deserves to know what the term "otherwise extensive" means if a four-level or three-level increase is to be applied.  Common sense, justice, and fundamental fairness demand at least that.

The Government has failed to sustain its burden in proving that either a four-level or a three-level increase for a role enhancement is warranted.  The Court readily acknowledges that the evidence is close, but it is factually insufficient to support a preponderance of the evidence standard.  Nevertheless, the Court is convinced, and the facts clearly establish by a preponderance of the

evidence, that a two-level increase for a role adjustment is appropriate, warranted, and reasonable under the circumstances under U.S.S.G. § 3B1.1(c).  The Court finds that Micheal Fisher managed or supervised at least one other "participant" in criminal activity and to argue to the contrary is disingenuous at best.

###### D.     ACCEPTANCE OF RESPONSIBILITY

The PSR established that Fisher was entitled to a two-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(A).  See PSR ¶ 55.  The Government did not object to a downward adjustment for acceptance of responsibility following the issuance of the PSR.  However, the Government has now objected to any downward adjustment and argues that Fisher has not accepted responsibility for all of his criminal conduct.  See Document No. 193, pp. 11-13.  The Government argues that Fisher has excused his behavior by claiming, among other things, that vague intra-family agreements existed that justified that payment of some of the personal expenses as business related; that Fisher blames others, including co-defendants Amiel Schaff and Clyde Frank, and blames a host of other employees of Fisher Sand & Gravel who worked in the Accounting Department.

The Court has carefully reviewed and considered U.S.S.G. § 3E1.1 of the Sentencing Guidelines as well as the commentary and application notes to that Guideline provision.  On May 29, 2009, Micheal Fisher entered open guilty pleas to counts 1, 2, 3, 5, 6, 9, 10, 11, and 12 of the superseding indictment.  The entry of a plea of guilty prior to the commencement of trial, combined with truthful admissions to the conduct which comprised the offense of conviction, and the truthful

admission of relevant conduct for which he is accountable, constitutes significant evidence of acceptance of responsibility.

The undersigned certainly recognizes that if a defendant merely enters a guilty plea he is not entitled to a downward adjustment under this Guideline provision as a matter of right.  However, the Court is in a unique position to evaluate Fisher's acceptance of responsibility having listened to the factual basis for his plea at both the change of plea hearing <u>and</u> the sentencing hearing.  The Court expressly finds that Fisher has accepted responsibility based upon the admissions he made at those hearings.  A defendant is not required to affirmatively admit all relevant conduct beyond the offense of conviction in order to obtain a reduction under U.S.S.G. § 3E1.1(A).

The Court further finds that Fisher has not falsely denied or frivolously contested critical relevant conduct, and in my view, has acted in a reasonable manner consistent with his acceptance of responsibility under the circumstances.  Fisher's open plea to nine felony counts manifested his acceptance of responsibility and also saved the Government considerable time and expense of, at a minimum, a six-week trial in federal court.  In reaching this conclusion, the Court has given careful consideration to all of the factors it is required to assess as set forth in U.S.S.G. § 3E1.1(A) and specifically in Application Note 1 (a-h).  Accordingly, the Court finds that Fisher is entitled to a two-level reduction pursuant to U.S.S.G. § 3E1.1 for acceptance of responsibility and such finding is made by the preponderance of the evidence.

In conclusion, based upon the factual findings made by the Court as set forth in detail this Sentencing Memorandum, which facts are supported by a preponderance of the evidence, the Court finds the following advisory Sentencing Guideline range applies:

**Base Offense Level:**                                      **20** (U.S.S.G. § 2T1.1; 2T4.1(H))

**Adjustment for Role in the Offense:**          **+2** (U.S.S.G. § 3B1.1(c))

**Acceptance of Responsibility:**                  **-2** (U.S.S.G. § 3E1.1))

**Total Adjusted Offense Level:**                **20**

**Criminal History Category:**                   **II** (U.S.S.G. § 4A1.3(b)(1))

**Advisory Guideline Range:**                     **37-46 months' imprisonment**

**IT IS SO ORDERED.**

Dated this 17th day of November, 2009.


                                  */s/ Daniel L. Hovland*_____
                                  Daniel L. Hovland, Chief Judge
                                  United States District Court